Good morning. May it please the Court. Opposing counsel, my name is Sharon Nelson and I represent Laura Holhalter in this particular appeal. I'd like to reserve five minutes of my argument time for rebuttal if I need to do that. The appeal focuses on a number of issues, but essentially both parties, I think, have attempted to distill down those issues for ease of dealing with the appellate process. One of the issues is the FMLA claim that Ms. Holhalter filed against her employer and the fact that the district court determined that that claim needed to show some type of monetary detriment in order for her to establish an adverse employment action. The district court also did not take into account... Isn't there a law that would contradict that? I'm sorry? Isn't there a law that would contradict what the district court's finding on that? There absolutely is. There absolutely is. I mean, the district court made the assessment that there had to be some type of monetary detriment, but there isn't any other law or any other precedent that requires that. And, in fact, there's cases that were in place before the appellate opening brief was filed that I think disputes what the district court said, but there's also a case that came down afterwards, and that was the Burlington case that came down after we filed our opening brief in this case. And Ray v. Henderson is a case that this circuit actually issued that I think refutes what the district court had ordered in the case. There is not a requirement, either under Ray v. Henderson or under Burlington, to show that there's... Burlington was fairly plaintiff-oriented in broadening adverse action, right? It was extremely plaintiff-oriented, which is why we have liked it so much in this particular case, yes. It expanded what we believe Ray v. Henderson started and essentially took into account a common-sense approach to apply in each specific situation with employers where someone has accused an employer of retaliation, courts are advised to take a common-sense approach and deal on a case-by-case basis whether specific incidents of conduct the employer or employee is complaining about actually constitute retaliation. And there's a reasonable person standard involved with that. There's an objective criteria that courts can use to address that as well. That was not done in this case. Well, the adverse action that you're claiming is the transfer, right? It is the transfer, absolutely. And everything coupled with the transfer. Obviously, the briefs talk about the fact that there was a transfer one week before she was to return from leave, that she was transferred into a territory that she was not familiar with, that territory had an issue about whether or not she could obtain ads with a high-end shopper that she previously sold in. That territory also required her to sell in a publication called The Mercury. However, The Mercury is the publication that her supervisor, Dennis Bunker, specifically said women were not allowed to solicit advertising for because it was an adult entertainment publication. And that's the publication that the men were given the opportunity to go solicit advertising on. So there were a number of things related to that transfer, including the transfer that were retaliatory under the standards of Ray v. Henderson. Was there a comment in the record previous to her taking the time about what might happen to her if she took the time? There absolutely is. She was approached by Dennis Bunker, who was one of her supervisors. He questioned her about whether or not she should take the leave. He indicated whether or not it was advisable for her to take the leave at that time, and then he went on to say I can't guarantee you that your territory is going to be here when you return or that your accounts will be here when you return. Then before the leave had actually expired, one week before the leave was to expire, and it was a six-month leave, he contacted her and said, you are being removed from the territory, your customer accounts are being taken from you. When she returned to work, that was the actuality that she faced. She had been placed in the other territory. Her customer accounts were taken from her. Some of those customer accounts that were grandfathered accounts that she brought with her from the prior territory, she protested about eventually was allowed to retain those accounts, but she was never returned 100% of her accounts. Explain to me how you think that what the relevance is of the three-month period where they augmented her salary relative to whether this was an adverse action. Well, I think the district court viewed it as relevant, because once the district court made the determination she had to show some type of monetary loss, it attempted to say that because of that bridge in salary, there had been no monetary loss. But that's not true. If you look at the record, she returned from her leave November 16th of 2003. The bridge was only for a three-month period. She left the company in March of 2004, so there was a period of time the bridge did not cover. In addition to that, she was required to train and assist the person who took over her old territory. Well, I guess being the devil's advocate, and this is the devil's advocate in your favor, and obviously I want to hear from the appellee about this, if they saw fit to pay her a bridge, doesn't that say that there was, that they knew that she was going to make less money by putting her there? So doesn't that support your argument that it was an adverse action? It does. It does support the argument that it was an adverse action. I'm not sure that they specifically were conceding she was going to make less money or they were simply responding to her concerns about that, but at either event, they did institute the bridge. One of the things that was completely ignored by the district court, though, even though the bridge was instituted, is the fact that, for example, in Burlington, an undesirable job assignment or transfer can still be considered adverse. If you're using the Ray versus Henderson standards and trying to ascertain if a reasonable employee would be discouraged from engaging in protected activity in the future, whether or not there was a bridge for a short period of time or whether or not the transfer was something that the company supposedly believed was appropriate, it's still conduct that would deter a reasonable employee from engaging in protected activity. Help me out here. What eventually happened to her? She eventually resigned. Resigned. On March 12th of 2004, she resigned. And when was the change to the other territory? She was notified the week before her leave expired that it was being changed. It was instituted upon her return. And what date? November 16th of 2003 is when she returned. Now, she's not been performing too well on the territory she was in. Isn't that correct? I don't agree with that assessment. She was never the top performer. But if you look through the table that's been provided in the record, there were times that you have to understand, it's a smaller sales division, so there was approximately four people, sometimes there were only three people in the sales division, but there were times that she was the second performer in that sales division. And even if you want to accept the respondent's argument that somehow she wasn't performing admirably, the record does not support that. This is a respondent who has a comprehensive sex harassment policy in place but can't seem to document performance problems with employees. So apparently there's been some development after the course of litigation that Ms. Holhalter had some performance issues related to her sales, but that was certainly nothing that was ever documented before litigation. All of the supervisors that we deposed admitted that they had not disciplined her for any performance-related issues. Give me your argument for gender discrimination on a tribal issue. Gender discrimination, we had two Title VII claims. The first was a disparate treatment Title VII claim. The judge also made some decisions with respect to that claim that we felt were in error. First of all, we believe that there was substantial direct evidence presented to the court of discriminatory animus, and the court did not agree with that. The court shifted to the McDonnell-Douglas burden-shifting analysis, and so I can address both of those things. We presented direct evidence based on the testimony of Ray Hurtado, who was Ms. Holhalter's direct supervisor. He said, essentially, that he believed that Bunker, who's the person at issue here, had a problem with Ms. Holhalter. He believed that Bunker had a problem with women. He believed that Bunker discriminated against women. He specifically testified that he heard sexist, chauvinistic remarks from Bunker. That, coupled with Holhalter's testimony, that Bunker would talk about women in very derogatory terms, using the word, and I don't know how much you want me to swear here. I think you should be specific, because those are the facts that you're saying create a tribal issue. Bunker repeatedly referred to women as bitches. Holhalter could recall over a two-year period at least 12 times that he had done that. Hurtado actually confirmed that testimony and said it was quite often that he referred to women as bitches. He would caution women in the workplace, be careful about how you act, because you don't want to put yourself out there and have a man think that you're available. This company segregated male employees and female sales associates into two separate meetings. And when I questioned the person who drafted the memo segregating the employees, he indicated that those individuals had different issues. There was a great deal of evidence that was presented to the district court that shows that there was discriminatory animus towards women that was exhibited by Bunker and that was tolerated in the workplace. This company had a policy for handling complaints. How many times did she complain? She complained repeatedly. What's that? She complained repeatedly. Repeatedly. What were they? Repeatedly. She complained to Brown, who was Bunker's direct supervisor. What was the complaint? She complained twice to Brown. What was the complaint? The first time she complained to Brown, she told him, I don't feel like I'm one of the boys. I'm not being included. That was the complaint? That was part of the complaint. I'm not one of the boys? I'm not one of the boys. I feel like I'm not included in the golfing events or play sports. I don't feel like we're getting the same type of treatment over there. I'm not one of the boys. What was the second complaint? The second time she said, well, at first she characterized it as a formal meeting, but to be fair, what the record says is that she had a conversation with Mr. Brown, where she talked about the sex harassment issues and said the work environment is so hostile and difficult to work in. That was the second complaint just to Brown. But she also went to Hurtado on more than one occasion and said, women specifically are being treated differently than the men, and one of the specific examples that she gave was that men were being allowed to advertise in the Mercury and seek advertising for the Mercury, which was the adult-oriented entertainment business publication. The feeling was, and what Hurtado responded to was, I can't do anything about that. This is Bunker's baby. And Hurtado was Ms. Holhalter's direct supervisor. She also went to Darlington on at least two occasions, and her testimony says at least 12 occasions about gender discrimination, two occasions about sex harassment. There is a dispute in the record and among the parties about whether Ms. Darlington was in a supervisory capacity. She was the office manager. The district court, however, in addressing that issue, should have given the plaintiff the benefit of the doubt and viewed facts unfavorable of Ms. Holhalter at the time of the summary judgment. Instead, what the district court did was adopt the representation by the defendants in that case that Darlington was not a supervisor, and so those complaints to Darlington were completely disregarded. Well, so if I'm distilling your argument on that, you're saying that the district court in that, at the summary judgment stage, weighed the evidence of Darlington, whether Darlington was a supervisor or an office manager, and what, because it's summary judgment, what the district court should have done is given all the inferences favorable to the plaintiff to determine whether there was a tribal issue. That is correct, and there are several statements throughout the district court's ruling that plaintiff's testimony or Ms. Holhalter's testimony was self-serving. That was made on more than one occasion, that comment by the district court. We took issue with that in our appellate paperwork, saying that indicates, too, that the district court was also weighing credibility, which is not something that should be done at the summary judgment stage. So all of those things caused us concern with respect to the gender discrimination claims. The court not only found that we failed to establish a prima facie case on behalf of Ms. Holhalter with respect to the treatment claim, it also showed that we failed to establish any evidence of pretext, and that's definitely not true, especially when there's direct evidence of discriminatory animus towards women. And that is discussed in detail in the Godwin v. Hunt-Wesson case that was cited in our appellate paperwork that I believe Judge Schroeder was directly involved with. In the Hunt-Wesson case, there was testimony in that case that female employees were treated differently. They were excluded from lunch events. They were excluded from golfing or other extracurricular activities. Did she play golf? Did your client play golf? She does not play golf. She does not play golf, Your Honor, but neither do I, and I can still ride around on a golf cart and try to elicit sales leads with individuals who are out playing golf. She was never given that opportunity. And we're talking about a highly charged sales environment where a good portion of her ability to support her family is dependent upon commissions. And if you're dealing with a situation where there are lunches that involve clients, golfing events that involve clients, extracurricular activities that involve clients, and women are systematically being excluded from those opportunities, it affects them in a sales environment. Now, one of the things that was sort of a double-edged sword that I kind of found interesting was that she claimed that she wasn't invited to the strip clubs for that. But then as an employer, if you invited people to the strip clubs, you would be accused of sexual, you know, I mean of having a hostile work environment. So that's one that, you know, I mean, it's sort of red flags, red flags either way. It is an interesting scenario that this case presents. And I will admit that some women would argue that an invitation to a strip club could constitute some type of sexual harassment. Because, you know, you can't put a dollar in the underwear that you can't get the client or something. But then on the other hand, if someone was forcing you to do that, say, hey, come and get the clients at the strip club, you'd get complaints. So that one's a little tough for me. That was a concern for us as well, quite candidly. But what we have argued and what we continue to argue is she should have been given the opportunity. If she was uncomfortable with going to that environment to solicit sales for the Mercury, then she could have voiced that opinion at that time. But to systematically exclude women just assuming that sales people will not want sales opportunities in the workplace, was it appropriate? Quickly, because I know you want to reserve time. I think your weakest argument is on the emotional distress. If this is emotional distress, then everything's going to be emotional distress. I would agree that our weakest argument is on the emotional distress. What we have argued in our brief and what we have attempted to maintain in this case is that when you have a work environment that's permeated with discriminatory animus towards women, and it is so flagrant that you have an employee that's going to at least three different supervisors, four in this case, she went to a manager by the name of Donna who advised her about getting the salary bridge, that is a significant amount of ongoing behavior. But, you know, it's not emotional distress. And I understand that some of the physical ramifications she had do not necessarily meet the legal requirement for emotional distress. Let me ask you two questions. First of all, back on the family leave act retaliation. The district court said that she didn't present any admissible evidence that moving her sales area adversely affected any term or condition of her employment. Her sales area was changed, as were the sales areas of employees who did not take leave. Was there evidence that this was a kind of a general reshuffling of employees to different territories? There was not, Your Honor. There was evidence elicited during the proceedings through the district court that there were other male sales associates who did have performance difficulties and whose territories were affected as a result of those difficulties. But one of the things that was done for one of the male salespeople was his territory was reduced to help his numbers. Another male employee, he was actually given additional clients that were taken from female account executives. And the other question is, what is the relief that you want? I want a right to take this case to a jury trial. That's what I want. Well, but what are you going to ask the jury to give you on the leave act? What are the damages? Well, at this point, we would like to measure the damages from the time that the salary bridge ended to the ending date of her employment. So there was a period of time in there that we actually have concrete damages that we can calculate for that time period. Okay. And then on the hostile work environment and harassment claims, what do you want? I believe that she's entitled to compensatory damages for that conduct, provided that we can show those damages. And also, I think in this given situation, we would ask for an instruction on punitive damages. Thank you. Good morning. Wendy Krincic on behalf of appellees. I guess I will start with the FMLA interference claim. And one comment I wanted to address was whether the Burlington Northern case is more restrictive of the Ray v. Henderson case. And I think that's not the case. The Burlington case broadened, actually, or I'm sorry, is more narrow than Ray v. Henderson in what can be considered an adverse employment action. In Ray v. Henderson, the standard was whether an action would reasonably deter an employee from engaging in protected activity. In the Burlington case, what the Supreme Court said the standard is, to quote them specifically, they say, we also conclude that the provision covers those and only those employer actions that would have been materially adverse to a reasonable employee or a job applicant. In the present context, that means that the employer's actions must be harmful to the point they could well dissuade a reasonable worker from making or supporting a charge of discrimination. Of course, that case was in the Title VII context. This is in the context of an FMLA interference claim. But the Ray v. Henderson decision by the Ninth Circuit focused on the plaintiff employee and whether it would reasonably, it was a subjective standard. Well, it's, the thing is, the problem that, you know, getting rid of the, I think I've kind of played my hand a little bit on the emotional distress part of it. But I do have some real concerns here that the trial judge weighed the evidence and didn't give the plaintiff all the inferences that they're entitled to on summary judgment. And, I mean, one was, I think, that the appellant indicated, but also on the, the court decided as a matter of law on the defense in terms of, because she didn't, said that she didn't report the harassment and so decided as a matter of law that they were entitled to a total defense under Farraher or whatever. Well, that's because, though, their policy, the harassment policy specifically identifies four specific individuals that employees can bring complaints to. Most employers have policies that say if you've got a complaint of harassment or discrimination, bring it to your supervisor, any other supervisor, or perhaps the Human Resources Department. Here there were four specific individuals that were identified. And they were the general manager, the general counsel, the director of the Human Resources Department, and the employee's immediate supervisor. All right, but isn't there a tribal issue as to reporting to the immediate supervisor? Well, for example, Ms. Hohalter testified that she made several complaints to Vicki Darlington. The only testimony, the only evidence that -. But she said Hurtado, too. She did say Hurtado. On the issue of Darlington, in her deposition, Ms. Hohalter said, I viewed Ms. Darlington as my supervisor. Ms. Darlington was deposed and Mr. Hurtado was deposed, and they gave evidence about what Ms. Darlington's duties were, and they had nothing to do with supervising the account executives, including Ms. Hohalter. What she did was she worked on the sales paperwork, making sure the sales orders were filled out completely and accurately. The testimony said she did not hire. There was some testimony to the effect that she could neck certain ads or something along those lines. I mean, she had some. Just for paperwork. She could reject paperwork, and then before it got rejected, finally it would go up to the next level. Mr. Hurtado or Mr. Bunker would review the situation. She couldn't hire, fire, discipline, do performance evaluations. She had no supervisory authority over the account executives in that way. And Hurtado is not a supervisor in this? Hurtado was a supervisor in that. I think the testimony about what the complaint was to Hurtado has been mischaracterized a bit. For example, Ms. Nelson talked about the Mercury publication and how Ms. Hohalter complained about the opportunity to sell into the Mercury publication because of the strip club issue. What that actually was, there was a one-time issue of the Mercury where they were going to approach some strip clubs to advertise in that, and some sales meetings were set up on one occasion between strip clubs and account executives, and the decision was made by Mr. Hurtado. It wasn't by Mr. Bunker just to send mail account executives on those calls. But these are all issues why you might win a trial, but we're at summary judgment. I understand. But that also was not a hostile environment complaint. That would be a disparate treatment complaint, which is separate from the Farragher-Eller. You don't have to draft a complaint, you know, draft a complaint for federal court in order to say I'm unhappy about what's going on here. And so I'm just wondering, is your position that the people who were in a position to do something about this didn't know what was going on? Because I didn't find that, I found that difficult to believe. I mean, it does sound like you're saying that I would like to talk to you, I looked at my employee handbook, and I would like to make a complaint under Title VII, I would like to make a disparate treatment complaint, and, you know, here. No, no, not at all. But as another example, when she put in evidence she complained to people. No, she put in evidence that she complained, she did not put in evidence that she complained about sexual harassment or in a way that would reasonably put the company on notice that her complaint was about sexual harassment. So, for example, when she's talking about her conversation with Mr. Brown, where she said she complained about sexual harassment, I've cited that deposition testimony from her in that regard, and she says what she talked about was sexual harassment. What she said to him in essence is that it's a difficult work environment over there because we're separated from the rest of the company, they were located in a separate building away from the company. I specifically said to her, did you tell him about the sexually harassing conduct that we discussed today, because we'd gone through all the comments that she contended were sexual harassment, and she said no, she did not. She told him she thought it was a difficult environment. That could mean many, many different things. What was Bunker's position? Bunker was the director of the direct mail division, so he was the department head, so to speak. He was the top guy. He reported to Mr. Brown, who was in charge of all the advertising. But if I could, if you don't mind, if I jump back to the effort. Have you reported to Bunker? She reported to Bunker? Was she supposed to complain to Bunker? Bunker didn't know that this was a bad situation. He's the one allegedly who was guilty of a good deal of this sexist behavior. He is accused of using inappropriate language, such as the word bitch and those kinds of things. But there is an obligation on an employee when they have a complaint, when they find conduct unwelcome, to put the company on notice so they can do something about it. And it's important to note that Ms. Hohalter did do that in the past. There was another employee not involved with allegations in this case that did refer to her. She thought he had referred to her as a bitch in the past, and when the company found out about it, they terminated him. There were inappropriate calendars hung up in the office. The evidence that was submitted on the record was that when the company learned of those calendars, they had them taken down. So there was evidence showing that when the policy is utilized, they take appropriate action, appropriate remedial action. She can make broad statements that I complained about sex harassment to this person and that person, but when you look at the record, which is what the district court did, and her actual testimony and the testimony of other people, she did not reasonably complain of sexual harassment as harassing conduct to them. Since this seems to be an important point, I wish we could go through it rather deliberately. The company had named four officials to whom she could complain. Now, did she complain to any one of them? The person that she is contending she complained to is her direct supervisor in that regard. Who is what? Well, she says it's Vicki Darlington, who we say the undisputed evidence is not a supervisor. She makes the statement that she complained of sexual harassment to Ray Hurtado. Okay. Now, what about that? Let's focus on that. Did she, or is that a disputed fact? Well, she says she did. Yeah. Mr. Hurtado denies that fact. But isn't that a disputed fact, then? That could be a disputed fact. She did not complain. She says she complained. It's in the same context that she says she complained to Brown. She says that her complaint to him, it's a difficult environment over here, is a complaint of sexual harassment. My position is I don't think that is a valid complaint of sexual harassment. I don't think that reasonably puts the company on notice that there's a sexual harassment issue. And then jumping back to the FMLA interference issue, what the court did, the court did not weigh the evidence. What the court did was look at what evidence was submitted and look for some evidence that the transfer, the change in her sales territory was adverse to her in some reason, for some reason. And Ms. Hohalter's problem was she did not present any evidence that it was adverse. The evidence was changes in territory were fairly frequent. She was aware of at least seven changes in other people's territory in the short time that she was employed, two years. She made an allegation that there was less earning potential in that territory. There was no evidence to back that statement up. The testimony from my client was that they ---- I guess, though, if you just look at the evidence most in her favor, a comment was made to her before she left, your territory might not be there if you take off. She takes off a week before she comes back while she's still on leave, you know, which I think if you were their lawyer, you would say, oh, don't transfer people while they're off on leave. That's not a good idea because that's a temporal type of situation. Then after they pay her three months, which would imply, I mean, it's a reasonable inference from that, is that it was a loss of income to put her somewhere else. But the bridge in salary only came up because Ms. Hohalter expressed concern that she felt there was less earning potential in the territory. In response, Mr. Bunker said, I don't think so. This is one of the highest growth potentials. If she says, he says, they pay. She doesn't deny that. Isn't that a triable issue? No. She does not deny that that was at her request and that Mr. Bunker granted her request for the bridge. That's not a dispute. I still don't. I think that's an argument you make to a jury. It's not an argument that wins the day on summary judgment. But I think on summary judgment, she has to come forward with some evidence, and I would point you to the Ninth Circuit cases in Henderson v. City of Simi Valley and Riviera v. Amtrak where they're talking in the context of what's a retaliatory action for Title VII purposes. They said on the summary judgment level that a plaintiff has to come forth with, in the Simi Valley case, specific facts, and in the Amtrak case, significant probative evidence that the action would deter an employee from engaging in protected activity. So here the district court was looking for some evidence that there was going to be some adverse repercussion for changing the territory, because it's something that happened fairly routinely with people. If someone told me right before I left, I can't promise you your same assignment if you take time off to get surgery, that would make me think twice. I know back in the day when I had a child, I was afraid I wasn't going to be in the same assignment when I came back. That was before all of this. I mean, people, that would deter the average person. If the change is going to be an adverse employment action, and here it wasn't going to be. Well, what about if I was a prosecutor and I was trying felonies, and I come back and I know I'm suddenly in misdemeanors, all right, but I'm making the same amount of money, but being in felonies is a higher level, it's more difficult cases, it's a career path. Is that an adverse action? Well, I don't really think it's fair to make that comparison, though, because here it wasn't even from the employer's perspective. It wasn't even something that was being meted out as a punishment. Rather, she wasn't doing well in the Summerlin territory, the territory that she had. And that's demonstrated by the chart that she herself is that. Did she disprove that by putting in evidence that she was the second highest producer? What it showed is in the months where she was the second highest producer, she was on a straight commission basis, whereas everybody else was on a base salary plus commission. So her commissions would logically be much higher because she's getting a higher commission, percentage of commission paid to her. But she was struggling in that territory, if that makes sense. So everybody else had a base of commission. That's a good argument to a jury, I give you that. Well, I mean, it was their evidence that they submitted, undisputed, that that's where she fell in the statistics when you were looking at the commission performance of the employees. And so the company's testimony was she was struggling in that territory. The sales figures, they submitted back that up. This other territory was thought to be perhaps a better fit for her sales skills. The commissions she was getting were high. Excuse me? The commissions she was getting were high. The commissions that she was getting were high when she was on a commission-only pay plan. She's lower when she switches to a base plus commission and is in a comparable situation to everybody else, then she's at the bottom of the pack. The same point with the FMLA interference claim goes to the gender discrimination claim. Ms. Holhalter would make broad allegations about how she was treated dissimilarly from male employees but had no evidence to back it up. For example, one of her main claims was that referrals coming into the department were given to male employees. In the record, you will see when she was questioned who were the male sales account executives that got these referrals, what accounts were they referred, who was making the referrals, she couldn't identify a single instance. So she didn't produce any admissible evidence to back up that allegation. Same thing, she also contended that the fact that she was initially paid a commission only was gender discrimination. When the evidence was that there were four people that were brought over at the same time as her, two of them were men paid base plus commission, the other one was a woman paid base plus commission, and she was paid commission only because that's what she was paid at her prior employer. Do we get to view that in a vacuum when you have a person that calls women bitches, saying they're on that time of the month, you know, and all the other things that she alleges? Do we get to view that in a vacuum? Well, she's got to make her prima facie case of showing that she's being treated dissimilarly from male employees, at least for the disparate treatment claim. What about the meetings, having separate meetings? You know, the evidence about the meetings is very mischaracterized in appellant's brief. There was a single meeting that was set up by Mr. Hurtado where male employees were going to meet separately to discuss and brainstorm what works well when selling to male-oriented businesses. Female employees were going to meet separately and discuss what works best when selling to female-oriented businesses, and then those ideas were going to be shared. So a male employee would have tips about how to sell to female businesses. You're putting a spin on it. That's what the evidence is in the record. But, I mean, it was one meeting, and there's no adverse repercussions. It was a brainstorming session. That's certainly not gender discrimination. And then I guess I'll just jump to the last issue, which is the emotional distress claim. The Nevada Supreme Court case law is very clear that to survive summary judgment on an emotional distress claim, you've got to come forward with some independently verifiable indicia that you've suffered emotional distress, like you've got a diagnosis, a prescription, received treatment by somebody qualified to treat emotional distress conditions, and there was none of that submitted in this case. How big is this company? Stevens Media Group. They publish newspapers around the country. They publish the Review Journal. Yeah. How big is their operation in Las Vegas? It's got to be several hundred employees. And the advertising unit of that is a major portion of it? Yes, except they were in what's called a direct mail division, so they're in the, like, secondary publications. How many people approximately are in that? I'm not sure. I believe the staff of account executives was perhaps four or five most of the time. Thank you. One of the things I wanted to point out is whether it's expanding on the evidence or not, to stand before this court and to say that men and women were segregated in meetings so that men could focus on selling to men-oriented businesses and women to women-oriented businesses is appalling. And it's the very reason why we're here, for a company to presume that women know better how to sell, and what is a men's oriented business? Is that Mary Kay? I mean, when does the discrimination stop? And what is a men's oriented business? Is that automotive repair? When does it stop? That in and of itself is highly indicative of how this company operated, and that's one of the pieces of evidence that we presented to this court. Burlington is absolutely instructive in this case. Burlington talks about social outings and different things that can actually create adverse actions, given the type of employment that an employee is involved with. This was a sales position. So obviously if you're excluding women from those types of activities, it's going to affect your sales associates who are female, more than your male sales associates. The Farragher defense that we took issue with as well is only a complete failure to follow company-established remedies or reporting procedures, constitutes an unreasonable attempt by the plaintiff to satisfy the second prong of the Farragher defense. And one of the things that they've argued is that she didn't report to Brown about sexual harassment. That is not true. If you look at the record on 00888, the court actually summarizes that deposition testimony. And the question was, did you bring to Mr. Brown's attention at that time any of the conduct that we discussed as being part of your sexual harassment claim? She says, not at that meeting. Okay. Did you tell Mr. Bob Brown that at some other meeting? Yes. Well, they're entitled to that instruction at a jury trial if the trial judge sees fit. Here, at summary judgment, it was determined as a matter of law, correct? Absolutely. Absolutely. Which is what we take issue with is that this case should have been submitted to a jury. It was not. And that's what we're asking as relief from this court. Thank you. Thank you very much.
judges: Schroeder, Noonan, Callahan